**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSICA PASQUINI and MONICA ROARK, individuals, on behalf of themselves, the general public, and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ZIFF DAVIS, INC. and EVERYDAY HEALTH, INC.,<br><br>Defendants. | CASE NO.<br><br>CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY; INTRUSION UPON SECLUSION; WIRETAPPING IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 631); USE OF A PEN REGISTER IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 638.51); COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; AND UNJUST ENRICHMENT<br><br>JURY TRIAL DEMANDED |

## TABLE OF CONTENTS


INTRODUCTION .......... 1

THE PARTIES .......... 3

FRAUDULENT CONCEALMEANT AND TOLLING .......... 3

JURISDICTION AND VENUE .......... 4

SUBSTANTIVE ALLEGATIONS .......... 4

A. Defendants Programmed the Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies. .......... 4

B. Defendants Falsely Informed Users That They Could Deny Consent to the Website's Use of Cookies. .......... 10

C. The Private Communications Intercepted and Collected Through Third-Party Cookies on Defendants' Websites. .......... 21

1. The Websites Cause the Interception of the Contents of Communications. .......... 21

2. Google Cookies. .......... 23

3. AppNexus Cookies. .......... 29

4. Additional Third-Party Cookies. .......... 30

D. The Third Parties Intercept User Communications While in Transit. .......... 37

E. The Signaling and Addressing Information Intercepted by the Third Parties. .......... 39

F. The Private Communications Collected are Valuable. .......... 41

PLAINTIFFS' EXPERIENCES .......... 42

CLASS ALLEGATIONS .......... 48

CAUSES OF ACTION .......... 50

First Cause of Action: Invasion of Privacy .......... 50

Second Cause of Action: Intrusion Upon Seclusion .......... 52

Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631) .......... 54

Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51) .......... 57

Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation .......... 59

Sixth Cause of Action: Unjust Enrichment .......... 63

PRAYER FOR RELIEF .......... 64

Plaintiffs Jessica Pasquini and Monica Roark ("Plaintiffs") bring this action on behalf of themselves, the general public, and all others similarly situated against Ziff Davis, Inc. and Everyday Health, Inc. ("Defendants"). Plaintiffs' allegations against Defendants are based on information and belief and the investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based on their personal knowledge.

## INTRODUCTION

1. This Class Action Complaint concerns egregious violations of consumer privacy and breach of consumer trust in violation of California law. When consumers visit Defendants' websites (specifically, whattoexpect.com (the "WhatToExpect Website") and www.babycenter.com (the "BabyCenter Website"), each a "Website" and collectively referred to as the "Websites"), Defendants display to them a popup cookie consent banner. Defendants' cookie banners disclose that the Websites use cookies but expressly give users the option to control how they are tracked and how their personal data is used. Defendants assure visitors that they can reject the Website's use of cookies to track them by clicking the "Do Not Consent" button as shown in the following screenshot from the BabyCenter Website:




2. Like most internet websites, Defendants designed the Websites to include resources and programming scripts from third parties that cause those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. Unlike many websites, however, Defendants affirmatively represented that users could browse the Website without being tracked, followed, or targeted by third-party data brokers and advertisers. Those representations were false.

3. Even after users elect to deny consent, Defendants surreptitiously cause several third parties, including but not limited to, Google LLC (DoubleClick and Google Analytics), Microsoft Corporation (AppNexus and Clarity), Live Ramp Holdings, Inc. (liadm.com), Amazon.com, Inc. (amazon-adsystem), Wunderkind Corporation (BounceExhange), Magnite, Inc. (Rubicon Project), Index Exchange, Inc. (Casale Media), TripleLift, Inc. (3lift.com), OpenX Technologies, Inc., Yahoo, Inc., Comscore, Inc. (Scorecard Research) and IPONWEB GmbH (Bidswitch), to place and/or transmit cookies that track users' website browsing activities and intercepted their private communications on the Websites (the "Third Parties").

4. Contrary to users' express denial of consent to the use of cookies and tracking technologies on the Websites, Defendants caused cookies, including the Third Parties' cookies, to be sent to Plaintiffs and other visitors' browsers, stored on their devices, and intercepted by the Third Parties along with user data. These cookies permitted the Third Parties to track and collect data in real time regarding the Websites visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

5. The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including, creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, Californians, people with young children, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

6. This type of tracking and data sharing is exactly what the Websites' visitors sought to avoid when they clicked the "Do Not Consent" button on the Websites' cookie consent banner. Defendants falsely told Website users that they respected their privacy choices and would refrain from tracking and data sharing when users rejected cookies. Despite receiving

clear notice of users' lack of consent, Defendants ignored those choices and violated state statutes and tort duties owed to Plaintiffs and those similarly situated Website users.

## THE PARTIES

7. Plaintiff Jessica Pasquini is, and was at all relevant times, an individual and resident of Sonoma, California. Plaintiff Pasquini intends to remain in California and makes her permanent home there.

8. Plaintiff Monica Roark is, and was at all relevant times, an individual and resident of Baldwin Park, California. Plaintiff Roark intends to remain in California and makes her permanent home there.

9. Defendant Ziff Davis, Inc. ("Ziff Davis") is a Delaware corporation with its principal place of business in New York, New York.

10. Defendant Everyday Health, Inc. ("Everyday Health") is a Delaware corporation with its principal place of business in New York, New York. Everyday Health is a wholly owned subsidiary of Ziff Davis.

## FRAUDULENT CONCEALMEANT AND TOLLING

11. The delayed discovery rule applies to Plaintiffs' and Class members' claims. Plaintiffs and Class Members were unaware that, despite clicking the "Do Not Consent" button, on the Websites, Defendant nonetheless caused third-party cookies to be sent to their browsers, stored on their devices, and intercepted by the Third Parties along with their private user data. Plaintiffs and Class members could not reasonably have discovered this conduct at the time of their visits to the Websites because it occurred through hidden, technical processes not visible to ordinary users. Nothing about Plaintiffs' or Class members' experiences on the Websites would have alerted a reasonable user that their selections were not being honored. Plaintiffs and Class members lacked the technical expertise and specialized tools necessary to determine whether the Websites honored their opt-out selection or instead continued transmitting their data notwithstanding their selection, and they did not discover Defendant's conduct until a later investigation revealed it.

12. Although they exercised reasonable diligence, Plaintiffs and Class members were unaware of Defendant's conduct because Defendant affirmatively represented that users could choose to decline consent to cookies and tracking technologies, while simultaneously concealing that such tracking would occur regardless of users' selections. This combination of misrepresentation and omission prevented Plaintiffs and Class members from discovering their claims earlier. These circumstances, including Defendant's concealment and misleading representations, warrant tolling the statute of limitations.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and Defendants are citizens of different states.

14. The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendants within, affecting, and emanating from, the state of California. Defendants regularly conduct and/or solicit business in, engage in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the state of California. Defendants have engaged, and continue to engage, in substantial and continuous business practices in the state of California.

15. Further, the Private Communications and data that Defendants cause to be intercepted by the Third Parties are routed through servers located in California.

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

17. Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## SUBSTANTIVE ALLEGATIONS

### A. Defendants Programmed the Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies.

18. Every website, including the Websites, is hosted by a server that sends and receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to

and from Internet users' browsers. For example, when a user clicks on a hyperlink on the Websites, the user's browser sends a "GET" request to the Website's server. The GET request tells the Website server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website server receives an HTTP request, it processes that request and sends back an HTTP response. The HTTP request includes the client's IP address, which allows the Websites' servers to identify the origin of the request and return the response.

19. An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

20. Defendant knows its Websites are accessed by Californians. Defendant configured its OneTrust consent platform to geolocate each visitor and select among consent rule groups based on that location. As seen in the example below, the user visited the WhatToExpect Website from California. When the user visited from California, the platform resolved the location to US/California and applied that rule group to determine the popup cookie consent banner presented to the user.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**




21. Defendants voluntarily integrated “third-party resources” from the Third Parties into their Website programming. “Third-party resources” refer to tools, content or services provided by third parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website’s code. Defendants’ use of the third-party resources on the Websites is done pursuant to agreements between Defendants and those Third Parties.

22. The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, enabling the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

23. First-party cookies are those that are placed on the user's device directly by the web server with which the user is knowingly communicating (in this case, the Website's server). First-party cookies are used to track users when they repeatedly visit the same website.

24. A third-party cookie is set by a third-party domain/webserver (e.g., www.google.com; adnxs.com; etc.). When the user's browser loads a webpage (such as a webpage of the Website) containing embedded third-party resources, the third-parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Website) and across multiple browsing sessions.

25. As described further below, the third-party cookies stored on and/or loaded from users' devices when they interact with the Website are intercepted by those third parties, enabling them to surreptitiously track in real time and collect Website users' personal information, such as their browsing activities and private communications with Defendants, including the following:

- **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;
- **Visit History**: Information about the frequency and total number of visits to the Website;

- **Website Interactions**: Data on which links, buttons, or ads on the Website that a user clicks;
- **User Input Data**: The information the user entered into the Website's form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;
- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website content;
- **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;
- **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;
- **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;
- **Referring URL**: Information about the website that referred the user to the Website;
- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Website during that session;
- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and/or
- **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible, including whether the user is located in California.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

26. Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase

preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to enhance website performance and generate revenue through data collection and targeted advertising.

27. Defendants operate a digital media business that provides health, wellness, pregnancy, parenting, and related informational content and services. Defendants own and operate the Websites, which allow visitors to, among other things, obtain information regarding pregnancy, fertility, childbirth, infant and child health, parenting, and early childhood development; search for information on particular health and parenting topics; access interactive tools and resources; and subscribe to newsletters and other personalized content. The Websites contain articles and resources concerning sensitive health and medical topics. For example, the BabyCenter Website includes articles addressing topics such as "Early signs of autism" and "Swollen testicles," while the WhatToExpect Website includes articles addressing topics such as "Fertility Treatment Options for Women" and "How to Manage Diabetes During Pregnancy." As users interact with the Websites—including by entering information into forms, searching for health or parenting topics, using interactive tools, viewing articles and other content, clicking links, and making selections—they communicate Private Communications to Defendants, including browsing history, visit history, website interactions, search queries and other user input data, demographic information, health- and parenting-related interests and preferences, device information, referring URLs, session information, user identifiers, and/or geolocation data, including whether the user is located in California.

28. Defendants chose to install or integrate their Websites with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Websites, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendants incorporate into their Websites, or that Defendants cause to be loaded. Because Defendants control the Websites' software code, and

are capable of determining whether a user is accessing the Websites from California, they have complete control over whether first-party and third-party cookies are placed on the California users' devices and/or intercepted by third parties.

29. Defendants explained the third-party cookies it used on the Website as follows in the BabyCenter Website Privacy Preference Center, which was accessible to users who clicked the "More Options" button in the cookie consent banner:

> **Performance Cookies.** These cookies allow us to count visits and traffic sources so we can measure and improve the performance of our site. They help us know which pages are the most and least popular and see how visitors move around the site...
>
> **Targeting Cookies.** These cookies may be set through our site by our advertising partners. They may be used by those companies to build a profile of your interests and show you relevant adverts on other sites. They do not store directly personal information, but are based on uniquely identifying your browser and internet device...
>
> **Social Media Cookies.** These cookies are set by a range of social media services that we have added to the site to enable you to share our content with your friends and networks. They are capable of tracking your browser across other sites and building up a profile of your interests. This may impact the content and messages you see on other websites you visit.

BabyCenter Website BabyCenter Website Privacy Preference Center.[1]

**B. Defendants Falsely Informed Users That They Could Deny Consent to the Website's Use of Cookies.**

30. When Plaintiffs and other consumers in California visited any of the Websites, the Website immediately displayed to them a popup cookie consent banner. As shown in the screenshot of the BabyCenter Website below, the cookie consent banner stated, "This website uses cookies to personalize content, analytics and ads. We also share information about the way you interact with our website, including health information interests, with our advertising and analytics partners who may aggregate this data with other information they have about you. Please click I Consent below to give us permission to do this. If you do not consent, please click Do Not Consent. For more information see our Privacy Policy." The banner then purported to

[1] The WhatToExpect Website Privacy Preference Center includes identical descriptions of performance and targeting cookies but it does not disclose the usage of social media cookies on the Website.

provide users the opportunity to click a "Do Not Consent" button as shown, in the following screenshot from the BabyCenter Website:




31. The WhatToExpect Website features a similar popup cookie banner that makes identical representations. It claims that users can reject cookies by selecting the "Do Not Consent" button as shown in the following screenshot of the WhatToExpect Website banner:




32. Plaintiffs and other users of the Websites who clicked or selected the "Do Not Consent" button, indicating their choice and/or agreement to decline all cookies and tracking technologies in use on the Websites, could then continue to browse the Websites, and the popup cookie consent banner disappeared.

33. Defendants' popup cookie consent banner led Plaintiffs, and all similarly situated users of the Websites in California, to believe that they declined or reject all cookies and tracking technologies, especially those used to "personalize content, analytics and ads." The banner further reasonably led Plaintiffs and those Website users similarly situated to believe that Defendants would not allow third parties, through cookies, to access their Private Communications with the Website, including their browsing history, visit history, website

interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon clicking or selecting the "Do Not Consent" button.

34. Defendants' representations, however, were false. In truth, Defendants did not abide by Plaintiffs' or other users' wishes. When Plaintiffs and other Website users clicked the "Do Not Consent" button, they provided notice to Defendants that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Websites.

35. Nevertheless, even after receiving that notice, Defendants caused third-party tracking cookies, including the Third Parties' cookies, to be placed on Website users' browsers and devices and/or intercepted by the Third Parties which enabled the Third Parties to collect user data in real time that discloses Website visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiffs tried to protect their privacy by rejecting cookies, Defendants failed to prevent cookies from being intercepted by the Third Parties, enabling them to track user behavior and communications.

36. In particular, when users clicked or selected the "Do Not Consent" button, Defendants nonetheless continued to cause the Third Parties' cookies to be placed on users' devices and/or intercepted by the Third Parties along with user data, enabling them to collect user data in real time that discloses Website visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiffs tried to protect their privacy by denying consent to the use of cookies, Defendants failed to prevent cookies from being intercepted by the Third Parties, enabling them to track user behavior and communications.

37. Some aspects of the operations of the Third Party cookies on the Websites can be observed using specialized tools that log incoming and outgoing Website network transmissions. The following screenshots, obtained using one such tool, show examples of Third-Party cookies being transmitted from a Website user's device and browser to the Third Parties even after the user clicked the "Do Not Consent" button on the Website's popup cookie consent banner.

a. From the BabyCenter Website:






**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**




**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**




**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**




**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

b. From the WhatToExpect Website:




**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**




| Name | Method | Status | Domain | Cookies |
|---|---|---|---|---|
| sr?v=422460&tier=1 | POST | 200 | capi.connatix.com | 1 |
| 1.jpg?crop=396:295,smart&widt... | GET | 200 | img.connatix.com | 1 |
| 1.png | GET | 200 | img.connatix.com | 1 |
| ps?v=422460&tier=1 | POST | 200 | capi.connatix.com | 1 |
| vast?slot=_sjS7FNc0qZ&page=... | GET | 200 | krk.kargo.com | 1 |
| ao?v=422460&tier=1 | POST | 200 | capi.connatix.com | 1 |
| connatix.omsdk.session.client-... | GET | 200 | cds.connatix.com | 1 |
| connatix.omsdk.service-web-1.... | GET | 200 | cds.connatix.com | 1 |
| liveintent/?cb=//i.liadm.com/s/3... | GET | 302 | b1sync.zemanta.com | 1 |
| b?c1=2&c2=6035818&cs_it=b9... | GET | 204 | sb.scorecardresearch.com | 1 |
| sync?tier=1&final=true&UserSc... | GET | 200 | capi.connatix.com | 1 |
| collect?v=1&_v=j101&a=17501... | POST | 200 | www.google-analytics.com | 1 |
| collect?v=2&tid=G-26LLVSCNH... | POST | 204 | www.google-analytics.com | 1 |
| dmedianet.js?cid=8CUBF27H4 | GET | 200 | contextual.media.net | 1 |
| collect?v=2&tid=G-26LLVSCNH... | POST | 204 | www.google-analytics.com | 1 |
| collect | POST | 200 | www.google-analytics.com | 1 |
| checksync.php?&usp_status=1... | GET | 200 | contextual.media.net | 1 |
| bridge3.616.1_en.html | GET | 200 | imasdk.googleapis.com | 0 |
| runner.html | GET | 200 | tpc.googlesyndication.com | 0 |
| bridge3.616.1_en.html | GET | 200 | imasdk.googleapis.com | 0 |
| bridge3.616.1_en.html | GET | 200 | imasdk.googleapis.com | 0 |
| container.html | GET | 200 | 505221a7f9fdeb20dae0adb97da2e46a.safeframe.googlesyndication.com | 0 |
| ping?e=4&d=Cg6CAQsI3I2hy4-... | GET | 204 | pagead2.googlesyndication.com | 0 |
| aframe | GET | 200 | www.google.com | 0 |
| g?v=422460&tier=1 | OPTIONS | 200 | capi.connatix.com | 0 |
| aframe | GET | 200 | www.google.com | 0 |
| bfp_ssn.js?templateId=3 | GET | 200 | pxlclnmdecom-a.akamaihd.net | 0 |
| container.html | GET | 200 | 92a355801c0fac22a045b28b5aef5d95.safeframe.googlesyndication.com | 0 |
| topics_frame.html | GET | 200 | securepubads.g.doubleclick.net | 0 |
| ping?e=4&d=Cg6CAQsI5Kebu... | GET | 204 | pagead2.googlesyndication.com | 0 |
| runner.html | GET | 200 | tpc.googlesyndication.com | 0 |
| event | OPTIONS | 200 | prebid-a.rubiconproject.com | 0 |
| event | OPTIONS | 200 | prebid-a.rubiconproject.com | 0 |
| generate_204?Q-lmyw | GET | 204 | tpc.googlesyndication.com | 0 |
| IHSjRKKj3q_1Pt3c2sGWHmUC... | GET | 200 | pagead2.googlesyndication.com | 0 |
| gen_204?id=xbid&dbm_b=AKA... | GET | 200 | pagead2.googlesyndication.com | 0 |
| b-904ac2d-bdc88dbc.js | GET | 200 | tagan.adlightning.com | 0 |

38. The screenshots above show the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third party websites while the user visited and interacted with the Websites. The screenshots depict only network traffic occurring ***after*** the user denied consent to use cookies using the cookie banner. As shown above, despite the user's denial of consent to use all cookies, the user's interactions with the Website resulted in the user's browser making a large number of GET and POST HTTP requests to third party web domains like www.google.com, adnxs.com, and others. As further shown in the right-hand column of the screenshots, the user's browser sent cookies along with those HTTP requests to the third parties. These screenshots demonstrate that Defendants caused third-party cookie data and users' Private Communications to be intercepted by the Third Parties, even after consumers declined all cookies and tracking technologies by clicking or selecting the "Do Not Consent" button. All of these network calls are made to the

Third Parties without the user's knowledge, and despite the user's denial of consent to use all cookies.

39. Plaintiffs' and other Website users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, were surreptitiously obtained by the Third Parties via these cookies.

40. As users interact with the Websites, even after clicking or selecting the "Do Not Consent" button, thereby declining the use of cookies and similar technologies for personalized content, advertising, and analytics, as well as the sale or sharing of the user's personal information with third parties for such functions, or other purposes, more data regarding users' behavior and communications is intercepted by third parties, alongside the cookie data. The Third Parties' cookies that Defendants wrongfully allow to be stored on users' devices and browsers, and to be intercepted by the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Website. Because third-party cookies cause the Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

41. The Third-Party code that the Websites cause to be loaded and executed by the user's browser constitutes a wiretap because, when it is executed, it causes the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on the Website users' Private Communications,

the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

### C. The Private Communications Intercepted and Collected Through Third- Party Cookies on Defendants' Websites.[2]

#### 1. The Websites Cause the Interception of the Contents of Communications.

42. The Websites both include search bars and other input fields through which users enter information. For example, below is a screenshot showing a user searching for "medication" on the BabyCenter Website:




[2] This section contains multiple examples of specific data being sent from a user's browser to third parties. Each example was collected after the user had clicked or selected the "Do Not Consent" button on the popup cookie consent banner.

43. When users enter search queries into these fields, they intend to communicate the contents of those queries directly to the Websites in order to obtain responsive information.

44. Instead, Defendants programmed the Websites such that the contents of those communications are intercepted by the Third Parties while the communications are in transit between users' browsers and the Website.

45. For example, the BabyCenter Website causes users' search queries to be intercepted by third parties, including Google, even after users have clicked the "Do Not Consent" button. When a user submits a search query, the Websites load a results page containing the user's query in the URL. The Websites cause that URL to by intercepted by third parties, thereby disclosing the contents of the user's search query. For example, when a user searched for "medication" on the BabyCenter Website, as shown above, the Website caused a request to be intercepted by Google's doubleclick.net domain that included a Referer header containing the URL of the search results webpage, along with associated identifiers, metadata, and cookies:




46. As shown above, the "referer" header intercepted by Google contains the exact search string (i.e., "medication") that the user entered into the Website's search bar, thereby disclosing to Google the contents of the user's communication with the Website.

47. The same is true for the What to Expect Website. As seen below, the "referer"

header intercepted by Google contains the exact search string (i.e., "diapers") that the user entered into the Website's search bar, thereby disclosing to Google the contents of the user's communications with the Website.




**2. Google Cookies.**

48. Defendants cause third party cookies to be transmitted to and from Website users' browsers and devices, even after users do not consent to the use of cookies (including advertising and analytics cookies) to and from the **<u>www.google.com, www.google-analytics.com, and doubleclick.net</u>** domains. Each of these domains is associated with Google LLC's digital advertising and analytics platform that collects user information via cookies to assist Google in performing data collection, behavioral analysis, user retargeting, and analytics.[3] Google serves targeted ads to web users across Google's ad network, which spans millions of websites and apps. Nearly 20% of web traffic is tracked by Google's DoubleClick cookies.[4] Google's cookies

---

[3] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).

[4] *See, e.g.* https://www.ghostery.com/whotracksme/trackers/doubleclick.

help it track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. Further, by identifying users who have shown interest in certain products or content, Google's cookies cause its advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Google's ad network.[5]

49. Specifically, Google sends cookies when a web user visits a webpage that shows Google Marketing Platform advertising products and/or Google Ad Manager ads.[6] "Pages with Google Marketing Platform advertising products or Google Ad Manager ads include ad tags that instruct browsers to request ad content from [Google's] servers. When the server delivers the ad content, it also sends a cookie. But a page doesn't have to show Google Marketing Platform advertising products or Google Ad Manager ads for this to happen; it just needs to include Google Marketing Platform advertising products or Google Ad Manager ad tags, which might load a click tracker or impression pixel instead." *Id.* As Google explains, "Google Marketing Platform advertising products and Google Ad Manager send a cookie to the browser after any impression, click, or other activity that results in a call to our servers." *Id.*

50. Google also uses cookies in performing analytical functions. As Google explains, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[7] "To measure a website … [one] add[s] a small piece of JavaScript measurement code to each page on [a] site." *Id.* Then, "[e]very time a user visits a webpage, the tracking code will collect … information about how that user interacted with the page." *Id.* Google Analytics enables website owners to "measure when someone loads a page, clicks a link, [ ] makes a purchase;" "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; and "views their shopping cart."[8]

---

[5] *See, e.g.* About cross-channel remarketing in Search Ads 360 (available at https://support.google.com/searchads/answer/7189623?hl=en); About dynamic remarketing for retail (available at https://support.google.com/google-ads/answer/6099158?hl=en&sjid=1196213575075458908-NC).

[6] *See* How Google Marketing Platform advertising products and Google Ad Manager use cookies (available at https://support.google.com/searchads/answer/2839090?hl=en&sjid=1196213575075458908-NC); *see also* Cookies and user identification (available at https://developers.google.com/tag-platform/security/concepts/cookies).

[7] How Google Analytics Works (available at https://support.google.com/analytics/answer/12159447?hl=en).

[8] Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and

51. Google's cookies allow it to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data—including whether a user is located in California.9

52. For example, after a user rejects cookies on the BabyCenter Website, the Google software code that Defendants cause to be stored on and executed by a Website user's device causes the following type of data—including cookie data—to be sent to Google's domain, at https://www.google.com/ads/measurement/l:

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

---

Recommended events (available at https://developers.google.com/analytics/devguides/collection/ga4/events).

[9] *See* About the Google Tag (available at https://support.google.com/searchads/answer/7550511?hl=en); How Floodlight Recognizes Users (available at https://support.google.com/searchads/answer/2903014?hl=en); How Google Ads tracks website conversions (available at https://support.google.com/google-ads/answer/7521212); Google Ads Help, Cookie: Definition (available at https://support.google.com/google-ads/answer/2407785?hl=en); About demographic targeting in Google Ads (available at https://support.google.com/searchads/answer/7298581?hl=en&sjid=1196213575075458908-NC&visit_id=638670675669576522-2267083756&ref_topic=7302618&rd=1); How Google Analytics Works (https://support.google.com/analytics/answer/12159447); Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://support.google.com/analytics/answer/9267735).

GET 204 https://www.google.com/ads/measurement/l?ebcid

Request Header Query Body Cookies Raw | Summary +

| Key | Value |
| --- | --- |
| :authority | www.google.com |
| :method | GET |
| :path | /ads/measurement/l?ebcid=ALh7CaQ5vTLuh62kAzS8xSX65EkrSsXAbWHYzQsSu_fIW7GejyU3nQgdRC2dAQ-lM6A7zrYKwN9q |
| :scheme | https |
| accept | image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8 |
| accept-encoding | gzip, deflate, br, zstd |
| accept-language | en-US,en;q=0.9 |
| cookie | 1P_JAR=2024-03-26-19; NID=512=dHhWWsGExmm9mkQ60qBd6mzLhQXcKeSX_A5YjB8OaLQOGcycawS20QEvMncB8tUNQOLqrbNuPBTQhx5JQigFK3yM6Fw4GDirHRVWDYa2iqg6hpXIJm4UxRSPx4k-K5r10i3ufPEzM7Q6Udk779i7OCyTC4kkW2zKnYxnMBVUxYZp9xG44CzJt1bSJkA9xY0YBG8fgKhNJ94 |
| Host | www.google.com |
| referer | https://www.babycenter.com/search?q=medication&refctnt=expert |
| sec-ch-ua | "Google Chrome";v="123", "Not:A-Brand";v="8", "Chromium";v="123" |
| sec-ch-ua-mobile | ?0 |
| sec-ch-ua-mobile | ?0 |
| sec-ch-ua-platform | "Windows" |
| sec-fetch-dest | image |
| sec-fetch-mode | no-cors |

GET 204 https://www.google.com/ads/measurement/l?ebcid

Request Header Query Body Cookies Raw | Summary +

| Key | Value |
| --- | --- |
| ebcid | ALh7CaQ5vTLuh62kAzS8xSX65EkrSsXAbWHYzQsSu_fIW7GejyU3nQgdRC2dAQ-lM6A7zrYKwN9q |

GET 204 https://www.google.com/ads/measurement/l?ebcid

Request Header Query Body Cookies Raw | Summary +

| Key | Value |
| --- | --- |
| 1P_JAR | 2024-03-26-19 |
| NID | 512=dHhWWsGExmm9mkQ60qBd6mzLhQXcKeSX_A5YjB8OaLQOGcycawS20QEvMncB8tUNQOLqrbNuPBTQhx5JQigFK3yM6Fw4GDirHRVWDYa2iqg6hpXIJm4UxRSPx4k-K5r10i3ufPEzM7Q6Udk779i7OCyTC4kkW2zKnYxnMBVUxYZp9xG44CzJt1bSJkA9xY0YBG8fgKhNJ94 |

53. As shown above, the Google software code that Defendants cause to be stored on and executed by the user's device causes various headers with names beginning with "sec-ch-ua…" to be sent to Google, revealing the user's browser, operating system, and device.

54. The "NID" cookie shown above is used for Google advertising. According to Google documentation, "[t]he 'NID' cookie is used to show Google ads in Google services for signed-out users," and "expires 6 months after a user's last use."[10]

55. The same is true on the What to Expect Website. For example, the Google software code that Defendant causes to be stored on and executed by a user's device when the user browses the What to Expect Website causes the following data to be sent to Google's advertising domain, at g.doubleclick.net:




[10] https://policies.google.com/technologies/cookies?hl=en-US.

56. The "url" and "tiba" parameters disclose to Google the exact webpage and title that the user was viewing.

57. The "u_h" and "u_w" parameters correspond to the user's screen height and width.

58. Finally, the data sent to Google contains the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

59. Because Google's cookies operate across multiple sites (i.e., cross-site tracking), the cookie enables Google to track users as they navigate from one site to another, and to comprehensively observe and evaluate user behavior online. Google's advertising platform aggregates user data to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics and audience segments based on shared traits (such as females, Millennials, Californians, etc.), and to perform targeted advertising and marketing analytics.

60. Thus, the Google cookies used on the Websites cause Google to track users' interactions with advertisements to help advertisers understand how users engage with ads across different websites. Further, the user data collected through the cookie enables the delivery of personalized ads based on user interests and behaviors. For instance, if a user frequently visits travel-related websites, Google will show her more travel-related advertisements. Further, the collected data is used to generate reports for advertisers, helping them assess the performance of their ad campaigns and make data-driven decisions (such as renaming their products). Further, Google's advertising platform enables advertisers to retarget marketing, which Google explains allows advertisers to "show previous visitors ads based on products or services they viewed on your website. With messages tailored to your audience, dynamic remarketing helps you build leads and sales by bringing previous visitors back to your website to complete what they started."[11]

[11] Dynamic remarketing for web setup guide (available at https://support.google.com/google-ads/answer/6077124).

61. Further, in its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "Google can access and analyze the Analytics data customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to improve ads personalization and relevance. These capabilities are critical to the value of the products we deliver to customers today."[12] Thus, Google can have the capability to use the data it collects for understanding online behavior and trends, machine learning, and improving its own products and services.

**3. AppNexus Cookies.**

62. The **adnxs.com** domain is associated with AppNexus, owned by Microsoft. Microsoft uses adnxs.com cookies to collect data on user navigation and behavior on websites, including information on user preferences and/or interaction with web-campaign content, to target advertisements.[13] The cookies include unique identifiers that help Microsoft recognize users across different websites and sessions.[14] This allows cookies set from the adnxs.com domain to collect data, including IP address, user demographic information, geographic location, page views, and interactions with websites.[15] These cookies also enable Household Attribution, a feature that enables Microsoft to match ads served on any device to website activity occurring on any device connected to the same network using the same IP address.[16] Further, the cookies enable advertisers to track the effectiveness of campaigns and avoid showing the same ads repeatedly to the same users. Microsoft uses this data to personalize ad content and track users

[12] Shared Data Under Measurement Controller-Controller Data Protection Terms (available at https://support.google.com/analytics/answer/9024351).
[13] https://cookiepedia.co.uk/host/adnxs.com.
[14] https://learn.microsoft.com/pdf?url=https%3A%2F%2Flearn.microsoft.com%2Fen-us%2Fxandr%2Fmonetize%2Ftoc.json.
[15] *Id.*; https://www.microsoft.com/en-us/privacy/privacystatement#mainpersonaldatawecollectmodule.
[16] https://learn.microsoft.com/pdf?url=https%3A%2F%2Flearn.microsoft.com%2Fen-us%2Fxandr%2Fmonetize%2Ftoc.json.

across the internet. Adnxs.com cookies also categorize users into different segments based on their interests, demographics, or behaviors. This segmentation is used to target specific audiences with tailored ads. The data collected by cookies set through the adnxs.com domain has allowed Microsoft to set up a platform in which advertisers can bid for and place advertisements targeted at users based on a variety of demographics, including, among other things, demography, device type, and location.[17]

63. Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users click or select the "Reject All" cookies button, to and from the **clarity.ms** domain. This domain is associated with Clarity, Microsoft's "cutting-edge behavioral analytics tool that helps you understand user interaction with your website or app".[18] Clarity is a Microsoft Advertising tool, which "crucial for successful marketing."[19] "Clarity's tracking code … uses a cookie to obtain user session data." [20]

64. Clarity allows Defendant to "watch live users in action" via "recordings of live user interactions" on the website, including a user's "clicks or taps, scrolling, navigation, and more."[21] Indeed, Clarity boasts that it "tracks all visitor clicks and scrolls on mobile, desktop, and tablet[.]" These "session recordings" track each and every consumer's individual actions on the website.[22]




[17] https://learn.microsoft.com/en-us/xandr/monetize/buy-side-targeting#other-targeting-guidance.
[18] https://learn.microsoft.com/en-us/clarity/setup-and-installation/about-clarity.
[19] https://about.ads.microsoft.com/en/blog/post/october-2021/introducing-microsoft-clarity-insights-for-microsoft-advertising.
[20] https://learn.microsoft.com/en-us/clarity/setup-and-installation/cookie-consent.
[21] https://clarity.microsoft.com/session-recordings.
[22] https://clarity.microsoft.com/session-recordings.

65. Further, Clarity permits Defendant to aggregate individual users' session recordings into "heatmaps" for Defendant's financial gain. Heatmaps are "visualization tool[s]" aimed at "aggregat[ing] information about how users interact with the website." [23] This allows Defendant to "See at a glance which areas on [web site owner's] page drive the most engagement," a crucial element to increasing advertising revenue. [24] Clarity also permits Defendant to "track a specific subset of users," including tracking metrics like what browser users visited from, what type of device, the date, and more. Clarity even permits the use of specific "Clarity user ID[s]" which permits Clarity to track users across their devices, and identify when the same user visits multiple times to the website.[25] Businesses use Clarity to "make data-driven decisions" to "improve overall conversion rates" of clicks, engagement, or sales.[26] Microsoft notes in a Clarity case study that Clarity cookies permitted businesses to see a "substantial increase" in "purchases." [27] In one instance, "following just five days after implementing Clarity, the [business] saw an uplift of 19% in conversion rate."[28] Businesses consider Clarity a "must-have tool for any business serious about optimizing their website and increasing online revenue."[29]

66. Microsoft collects data from Clarity,[30] which "Microsoft retains . . . for as long as necessary[.]"[31] Clarity cookies allow Microsoft to obtain and store at least the following user data: (i) user identifier; (ii) website interactions; (iii) interests and preferences; (iv) shopping behavior; (v) device information; (vi) demographic data; (vii) geolocation data; (viii) referring URL; and (ix) session information. [32]

---

[23] https://learn.microsoft.com/en-us/clarity/heatmaps/heatmaps-overview.
[24] https://clarity.microsoft.com/heatmaps.
[25] https://clarity.microsoft.com/insights; https://learn.microsoft.com/en-us/clarity/setup-and-installation/identify-api.
[26] https://clarity.microsoft.com/case-studies/ecommerce-boost/#:~:text=Using%20Clarity&text=By%20analyzing%20user%20sessions%20and,and%20improve%20overall%20conversion%20rates.
[27] *Id.*
[28] *Id.*, emphasis in original.
[29] https://clarity.microsoft.com/case-studies/ecommerce-boost/#:~:text=Using%20Clarity&text=By%20analyzing%20user%20sessions%20and,and%20improve%20overall%20conversion%20rates.
[30] https://www.microsoft.com/en-us/privacy/privacystatement.
[31] *Id.*
[32] https://learn.microsoft.com/en-us/clarity/setup-and-installation/clarity-data.

**4. LiveRamp Cookies.**

67. Defendant causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users click or select the "Reject" button, to and from the **liadm.com** domain.[33] This domain is associated with LiveRamp, a software company that allows businesses to combine customer data from various online and offline sources and leverage that data for marketing and analytics purposes.[34] Pippio.com cookies are used to create an online identification code for the purpose of recognizing users' devices and tracking their user behavior.

68. These cookies enable LiveRamp to obtain and store at least the following user data: browsing history, visit history, website interactions, user input data (such as email address), demographic information, interests and preferences, device information, user identifiers, and geolocation data (including IP addresses), on the Websites. The unique user identifier enables LiveRamp to sell a user's unique data for use in online and cross-channel advertising (including targeted advertising and email marketing).

69. LiveRamp explains in its Privacy Notice the user data it receives from pippio cookies installed on "partner websites" and how it uses (and monetizes) that data as follows:

> [The website] partner may sell or share personal information collected from you, such as your email, cookies set on your browser, IP address, or information about your browser or operating system, with LiveRamp. LiveRamp uses this information to create an online identification code for the purpose of recognizing your device. This code may be placed in our partners' cookie and for use in online and cross-channel advertising (including targeted advertising and email marketing), or LiveRamp may connect it to LiveRamp's own 3rd-party cookie and other identifiers. In addition, by associating an email address with a cookie, LiveRamp and third parties can link your browsing activity across different websites and other applications and services to your specific device associated with the email address, identifying the user behind the device. This means that, even when browsing unrelated sites, your online activity can be connected to you for advertising and other marketing-related purposes, including email marketing and offline advertising...
>
> The personal data and identifiers we collect (for instance, a cookie ID) may be linked to other personal data and identifiers through known associations and/or identity resolution (for instance, an identifier derived from or associated with a hashed email address and LiveRamp cookie 1234 might be associated with partner cookie 5678), and shared with advertising partners and other third party advertising

[33] *See* LiveRamp Product and Service Privacy Notice (available at https://liveramp.com/privacy/service-privacy-policy/).

[34] *See* https://liveramp.com/privacy/service-privacy-policy/#section1a; *see also* LiveRamp Data Marketplace (available at https://liveramp.com/data-marketplace/).

> companies for the purpose of enabling interest-based content or targeted advertising throughout your online and offline experiences (e.g., web, TV [MVPDs], connected TV, mobile applications, email marketing and other media). These third parties may in turn use this identifier to link demographic or interest-based information you have provided in your interactions with them. Note that LiveRamp does not itself provide the service of targeted advertising (sometimes referred to as "cross-context advertising") but, rather, processes and transfers data to an advertiser's advertising platform so that platform can provide targeted advertising services...[35]

**5. Additional Third-Party Cookies.**

70. Defendants also cause third-party cookies to be transmitted to and from Websites' users' browsers and devices, even after users elect deny consent to the use of cookies, to and from other domains, including (i) s.amazon-adsystem.com; (ii) bounceexchange.com; (iii) rubiconproject.com; (iv) casalemedia.com; (v) 3lift.com; (vi) openx.net; (vii) yahoo.com; (viii) scorecardresearch.com; and (ix) bidswitch.net.

71. The **s.amazon-adsystem.com** domain is associated with Amazon's advertising services. Amazon utilizes cookies to collect data on user interactions with websites (including browsing behavior and preferences) to perform advertising and personalization functions, i.e., to assist Amazon in delivering advertisements tailored to user interests. Further, the cookies perform analytics functions to enable Amazon to measure and analyze the performance of its services and to ensure that ads are effective and relevant.

72. The **bounceexchange.com** domain is associated with Wunderkind Corporation, a company that provides businesses with behavioral marketing and conversion optimization tools. It utilizes using visitor data to increase website conversions through features like exit-intent popups, personalized messaging, and retargeting. Wunderkind uses BounceExchange cookies to track user behavior on websites (such as user actions like page views, clicks, scrolling behavior, time spent on site, and form submissions); personalized offers and messaging (i.e., based on the data collected by the cookies, BounceExchange can trigger personalized pop-ups, overlays, or banners. For example, if a user has visited a site multiple times but has not completed a purchase, the system might show them a special offer or discount to encourage conversion); analytics and reporting (i.e., BounceExchange uses data collected by the cookies to track whether a visitor becomes a customer to allow website owners to analyze which

[35] *Id.*

interactions lead to purchases); and user segmentation and targeting (i.e., BounceExchange uses cookies to help businesses retarget users who have shown interest in certain products or services and deliver targeted advertisements to them through other platforms).[36] As Wunderkind explains: "We place our tag and pixel on your site, allowing the Wunderkind Identity Network to enhance known customer profiles and identify a significant amount of your anonymized website traffic. We process trillions of events across tens of billions of browsing profiles, giving us an unmatched understanding of consumers. With this robust data available to our AI engine, Wunderkind can scale targeted and personalized email and text sends that drive unrivaled returns for our clients."[37]

73. The **rubiconproject.com** domain is associated with the Rubicon Project, an advertising exchange platform owned by Magnite, Inc.[38] Rubicon Project operates as a Supply-Side Platform (SSP), enabling website publishers to sell their advertising inventory through real-time bidding auctions. Its cookies are used to assign unique identifiers to users, collect data on their browsing behavior (including IP address, location, and websites visited), and facilitate the exchange of this user data with various ad services.[39] This process, known as cookie syncing, allows advertisers to identify and bid on ad impressions to target specific users across the web, forming a foundational component of the programmatic advertising ecosystem.[40]

74. The **casalemedia.com** domain is associated with Casale Media, a digital advertising platform owned by Index Exchange, Inc., that operates as part of an ad exchange network.[41] Casale Media's cookies are used to collect data about users' website visits and online behavior, including the number of visits, time spent on sites, and pages loaded.[42] This

---

[36] *See, e.g.,* Wunderkind Help Center: Conversion Pixel Overview (available at https://support.wunderkind.co/hc/en-us/articles/24664114189339-Conversion-Pixel-Overview); and Wunderkind Help Center: Smart Tag Overview Browser Support (available at https://support.wunderkind.co/hc/en-us/articles/24664130565659-SmartTag-Overview-Browser-Support).

[37] Wunderkind Performance Marketing (available at https://www.wunderkind.co/how-it-works/performance-marketing-solutions-for-ecommerce/).

[38] *See* Platform Cookie Policy - Magnite, accessed September 26, 2025, https://www.magnite.com/legal/platform-cookie-policy/.

[39] *See id.*; *See also* User Choice Portal | Manage Your Privacy Preferences with Magnite, accessed September 26, 2025, https://www.magnite.com/legal/user-choice-portal/.

[40] *See id.*

[41] *See* https://www.indexexchange.com/about/.

[42] *See* https://www.indexexchange.com/privacy/exchange-platform-privacy-policy/.

information is used to build user profiles for the purpose of delivering targeted advertising.[43] The platform enables advertisers to segment audiences and optimize ad relevance by tracking users across multiple websites within its network, and its cookies can also be used for functions like frequency capping to limit the number of times a user is shown the same advertisement.[44]

75. The **3lift.com** domain is associated with TripleLift, Inc., an advertising technology platform that specializes in programmatic advertising.[45] TripleLift's cookies are used to assign a unique digital identifier (stored in the "TLUID" cookie) to a user's browser or device.[46] This identifier enables the tracking of users across different websites to collect data for targeted advertising, including interest-based targeting and ad performance measurement.[47] The company also leverages first-party publisher data to create audience segments, positioning this as an addition to traditional third-party cookie tracking in response to industry privacy changes.[48]

76. The **openx.net** domain is associated with OpenX Technologies, Inc., a digital advertising technology company that operates a programmatic ad exchange.[49] OpenX uses cookies to facilitate the buying and selling of digital advertising. These cookies assign unique online identifiers to users, which are used to collect data across different websites about their online activity, browsing history, and inferred interests.[50] This information enables interest-based advertising, allowing advertisers to target specific users with relevant ads. The platform also uses cookies for ad delivery management, such as controlling ad frequency, measuring campaign performance, and syncing user identifiers with other advertising partners.[51]

77. The **yahoo.com** domain is owned by Yahoo Inc., a technology company that focuses on online media and advertising. Cookies set by the yahoo.com domain are used to target website users with advertising by assigning Website users unique identifiers.[52] These cookies

[43] *Id.*
[44] *Id.*
[45] *See* https://triplelift.com/.
[46] *See* https://triplelift.com/user-rights-policy-and-opt-out/.
[47] *See* https://triplelift.com/platform-privacy-policy/.
[48] *See* https://triplelift.com/resources/case-study/triplelift-audiences-exceed-benchmarks/.
[49] *See* https://www.openx.com/publishers/ad-exchange/.
[50] *See* https://www.openx.com/privacy-center/ad-exchange-privacy-policy/.
[51] *See id.*
[52] https://cookiepedia.co.uk/host/yahoo.com.

collect information, such as IP addresses, browser type and settings, operating system, device type, and advertising identifiers from other third parties, including Apple's ID for Advertising, Apple's ID for vendors, Google's Android ID, and Google's Play Store Ad ID.[53] Cookies are further used to support Yahoo's targeting of content and advertising and to associate users, devices, and accounts with each other or with those in a similar location, such as in the same household.[54] Yahoo's use of a unique identifier with its cookies allows it to track users across the internet and across different devices.[55] The purpose of Yahoo Inc.'s cookies and the data they collect is to track users and target them with advertisements—the sale of which Yahoo uses to generate revenues.

78. The **scorecardresearch.com** domain is associated with Comscore, Inc.'s Scorecard Research service, a "leading global market research effort that studies and reports on Internet trends and behavior."[56] The ds.scorecardresearch.com domain collects a user's online identifiers, ("e.g., cookie identifiers, other hardware or device identifiers, and IP addresses"), geolocation data, browsing history, operating system, browser type, website preferences, and the duration and time of the user's website access.[57] Scorecard Research then processes "the information collected . . . to draw inferences about your predicted characteristics and preferences,"[58] which it then sells to businesses "around the world."[59] Scorecard Research then sells this collected data to website owners for a profit.

79. The **bidswitch.net** domain is associated with BidSwitch, a technology platform owned by IPONWEB GmbH that functions as middleware in the programmatic advertising ecosystem.[60] BidSwitch's cookies are not used to directly serve ads to users, but rather to facilitate the service of ads between Supply-Side Platforms (SSPs) and Demand-Side Platforms

---

[53] https://legal.yahoo.com/us/en/yahoo/privacy/topics/cookies/index.html#:~:text=When%20you%20log%20in%20to,or%20device%20you%20are%20using.
[54] *Id.*
[55] *Id.*
[56] ScorecardResearch website (available at https://www.scorecardresearch.com/).
[57] ScorecardResearch Privacy Policy (last updated June 1, 2023) (available at https://www.scorecardresearch.com/privacy.aspx?newlanguage=1).
[58] *Id.*
[59] ScorecardResearch About page (available at https://www.scorecardresearch.com/about.aspx?newlanguage=1).
[60] *See* https://www.bidswitch.com/.

(DSPs).[61] The cookies store unique user IDs and regulate the synchronization of these IDs across different advertising services.[62] This "cookie syncing" is essential for enabling advertisers on various platforms to recognize a user and participate in real-time bidding auctions for ad space on publisher websites, effectively acting as a central hub for identity matching in the ad-tech industry.[63]

80. These cookies allow these Third Parties to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) demographic information, (v) interests and preferences, (vi) shopping behaviors, (vii) device information, (viii) referring URLs, (ix) session information, (x) user identifiers, and/or (xi) geolocation data—including whether a user is located in California.

**D. The Third Parties Intercept User Communications While in Transit.**

81. On information and belief, the Third Parties intercept user communications while those communications are in transit from consumers' browsers to Defendants' Websites. The Third Parties operate large-scale data ingestion systems designed to receive, read, and act upon incoming data streams in real time, as the data is transmitted over the network, before it is committed to storage. As the user data is transmitted over the wire, it is transmitted as a raw payload that cannot be used until the Third Party reads and processes it using at least the steps described below. These steps necessarily require contemporaneous access to the contents of the communications while they are in transit.

82. First, the Third Parties must read the data in real time in order to ***transform*** it into a usable format for subsequent processing. Transforming, for example, may involve converting long html-encoded strings and decoding them to a format such as Unicode Transformation Format, which is more amenable to subsequent processing.

83. Second, the Third Parties read the data in real time in order to ***deduplicate*** events transmitted through multiple channels. Most websites transmit the same user interaction twice: both directly from the user's device and separately through a server-to-server API, to ensure

[61] *See* https://www.bidswitch.com/privacy-policy/.
[62] *Id.*
[63] https://clearcode.cc/blog/what-is-bidswitch/.

reliability.[64] Third Party platforms encourage this redundant configuration and automatically compare identifiers contained within the transmitted data—such as event identifiers and device identifiers—to determine whether multiple transmissions correspond to the same user action. This deduplication occurs as the communications are received, before they are stored.

84. Third, the Third Parties read and analyze incoming communications in real time to ***validate*** and ***filter*** the data, including to detect invalid, malicious, or anomalous transmissions and to determine whether the data complies with internal processing rules. These determinations must be made immediately upon receipt of the communication in order for the Third Parties' systems to function.

85. Fourth, the Third Parties perform real-time ***analytics*** on user communications to determine their meaning and significance. This processing is used to interpret the data, associate it with particular users or devices, and to determine what real-time events or actions should be taken in response, such as triggering advertising delivery, notifications, or other automated responses. This step typically involves applying artificial intelligence and machine learning algorithms to the data. These determinations occur while the data is in motion, prior to final storage.

86. To accomplish each of the functions described above, the Third Parties employ real-time stream processing platforms specifically designed to operate on data "in flight"—that is, after it is transmitted from a user's browser but before it is committed to the Third Parties' storage. Examples of such platforms include Apache Flink, Kafka, and Amazon Kinesis. Industry documentation confirms that these systems are designed to read, transform, analyze, and act upon data streams as they are received.

87. On information and belief, the other Third Parties also use ingest-phase processing platforms that perform real-time analytics and filtering on incoming data streams before storage. For example, Google developed MillWheel, an internal stream processing

[64] For example, Google's server-to-server API is the **Google Ads Conversion API**. On information and belief, each of the Third Parties uses a server-to-server API to collect user data.

system, as well as Flume/FlumeJava, which evolved into Google Cloud Dataflow.[65] Google Cloud Dataflow enables Google to perform many functions on real-time data at the "Ingest" phase, before it is stored.[66] Google, which sells Dataflow to third party developers for use with their own products, states that Dataflow is used "to create data pipelines that read from one or more sources, ***transform the data***, and write the data to a destination."[67] One use for Dataflow is the "[r]eal-time machine learning (ML) analysis of streaming data."[68] Google confirms that Dataflow is "suitable for more advanced applications, such as real-time streaming analytics."[69]

88. Accordingly, the Third Parties' platforms do not operate as passive recipients that merely record user communications. Instead, they function as active interceptors that contemporaneously read and process the contents of user communications—including the Private Communications—by transforming, deduplicating, validating and filtering and analyzing in real time while those communications are in transit between the user's browser and Defendants' Websites.

**E. The Signaling and Addressing Information Intercepted by the Third Parties.**

89. The "signaling" and "addressing" information captured and recorded by the Third Parties includes TCP and/or UDP port numbers associated with outgoing communications initiated by Plaintiffs' and Class members' browsers and devices. In the context of Internet Protocol (IP) networking, port numbers function as sub-addresses that direct traffic to specific software processes. By recording these port numbers, the Third Parties identify and distinguish specific network connections and the communicating endpoints involved (e.g., a Plaintiff's or Class Member's IP address and TCP/UDP source port communicating with a Third Party's destination IP address and destination port such as 443). These port numbers constitute addressing information associated with the communications initiated by Plaintiffs' and Class

---

[65] *See, e.g.*, Google Cloud Blog, "How cloud batch and stream data processing works" (August 2020), https://cloud.google.com/blog/products/data-analytics/how-cloud-batch-and-stream-data-processing-works.
[66] Google Cloud Blog, "BigQuery explained: An overview of BigQuery's architecture" (September 2, 2020), https://cloud.google.com/blog/products/data-analytics/new-blog-series-bigquery-explained-overview.
[67] Google Cloud Documentation, "Dataflow overview," https://docs.cloud.google.com/dataflow/docs/overview (emphasis added).
[68] *Id.*
[69] *Id.*

members' browsers and devices and fall within the "instruments" and "facilities" contemplated by California Penal Code § 638.50(b).

90. The "signaling" information also includes protocol-level metadata recorded by the Third Parties during connection establishment and session management, such as the initiation and acceptance of TCP connections and the TLS handshake and negotiation metadata used to establish HTTPS sessions. This signaling information is transmitted by Plaintiffs' and Class members' devices to initiate, coordinate, and manage electronic communications with the Third Parties. Because this metadata enables management of the connection rather than the substance of the message, it constitutes record information regarding the characteristics of the communication, rather than communication content, and falls squarely within the statutory definition of a pen register.

91. Additionally, the Third Parties record HTTP request header metadata, such as the "Host" header and connection-management headers (e.g., "Connection" in HTTP/1.1), which function as digital "dialing" information. Just as a traditional pen register records the number dialed to reach a destination, these headers identify the intended web origin (via "Host") and specify how the client requests the connection be handled for that request (e.g., whether to keep the connection open). This header information is transmitted as part of Plaintiffs' and the Websites' users' HTTP requests and, together with the destination network address and port, enables the receiving Third Party to identify and log the destination and handling characteristics of Plaintiffs' and the Websites' users' communications, separate from any underlying user input or message content.

92. Finally, the Third Parties' receiving infrastructure (e.g., servers, edge services, and/or load balancers) observes and records network-level and transport-level routing and addressing metadata associated with communications initiated by Plaintiffs' and the Websites' users' browsers and devices. This metadata includes destination IP addresses, port identifiers (such as 443 for HTTPS), and related connection and session attributes, including connection initiation and termination timestamps, connection duration, and identifiers such as the protocol used (TCP or UDP), the source IP address, the source port, the destination IP address, and the

destination port. The Third Parties use this information in real time to identify and log the origin and destination endpoints of Plaintiffs' and the Websites' users' electronic communications and the characteristics of those connections, separate from any substantive "message" or "contents" carried at the higher-level Application layer.

**F. The Private Communications Collected are Valuable.**

93. As part of their regular course of business, Defendants target California consumers by causing the Third Parties to extract, collect, maintain, distribute, and exploit for Defendants' and the Third Parties' profit all of the Private Communications transferred by the cookies which Defendants cause to be placed on Plaintiffs' and other California Website users' devices without their knowledge or consent. Defendants knew the location of consumers like Plaintiffs and the Class members either prior to or shortly after causing the Third Parties to use cookies on their devices after Plaintiffs and Class members decline consent to all cookies.

94. The Private Communications tracked and collected through cookies on the Website are valuable to Defendants and the Third Parties. Defendants use this data to measure and optimize marketing campaigns, evaluate website design and product placement, and target specific users or groups of users with advertising. For example, Defendants can identify California users who visit webpages related to particular health and wellness products and then target those users with advertisements for similar products both on the Websites and across unrelated third-party websites.

95. Data reflecting users' browsing activity allows Defendants to identify behavioral patterns, preferences, and interests relating to Defendants' products. At scale, this data enables Defendants to assess trends across their Websites and within the broader health and wellness product market. Defendants monetize this data by leveraging it to increase user engagement, advertising effectiveness, and overall revenue.

96. The value of the Private Communications tracked and collected by the Third Parties using cookies on the Websites can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[70] Indeed, "[t]he monetary value

[70] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

97. Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell their data or the consumer's willingness to pay to protect their information.

98. By falsely representing consumers' ability to decline cookies, and by aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to collect users' Private Communications, Defendants unjustly enrich themselves at the expense of consumer privacy and autonomy. Defendants deprive consumers of the ability to decide whether, and on what terms, their data may be monetized.

## PLAINTIFFS' EXPERIENCES

**Plaintiff Pasquini**

99. Plaintiff Pasquini visited the BabyCenter Website to seek and obtain information about health and parenting topics, while located in California, on one or more occasions during the last four years.

100. Plaintiff Pasquini's visits to the BabyCenter Website were consistent with those of an ordinary user seeking pregnancy, health, child-development, and parenting information. Plaintiff Pasquini is not a consumer advocate, "tester," or compliance auditor who visited the BabyCenter Website to test or evaluate Defendants' privacy practices.

101. When Plaintiff Pasquini visited the BabyCenter Website, it immediately detected that she was a visitor in California and presented her with Defendants' popup cookie consent banner, which provided the option to select the "Do Not Consent" button. Plaintiff Pasquini viewed Defendants' representation on the popup cookie consent banner that, "This website uses cookies to personalize content, analytics and ads. We also share information about the way you interact with our website, including health information interests, with our advertising and analytics partners who may aggregate this data with other information they have about you.

Please click I Consent below to give us permission to do this." Plaintiff Pasquini also viewed Defendants' additional representation that users could "click Do Not Consent."

102. Plaintiff Pasquini clicked the "Do Not Consent" button. Plaintiff Pasquini believed that selecting the "Do Not Consent" button on the popup cookie consent banner found on the BabyCenter Website would allow her to opt out of, decline, and/or reject all cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks and analytics services for the purposes of providing personalized content, advertising, and analytics services).

103. In selecting the "Do Not Consent" Button Plaintiff Pasquini gave Defendants notice that she did not consent to the use or placement of cookies and tracking technologies while browsing the BabyCenter Website. Further, Plaintiff Pasquini specifically denied consent, based on Defendants' representations, to those cookies used to "personalize content, analytics and ads" and share information with third parties. In reliance on these representations and promises, only then did Plaintiff Pasquini continue browsing the BabyCenter Website.

104. Even before the popup cookie consent banner appeared on the screen, Defendants nonetheless caused cookies and tracking technologies, including those used for personalized content, advertising, and analytics, to be placed on Plaintiff Pasquini's device and/or intercepted by the Third Parties along with user data, without Plaintiff Pasquini's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Pasquini that she could deny consent to the use of cookies and tracking technologies while she browsed the BabyCenter Website was false. Contrary to what Defendants made Plaintiff Pasquini believe, she did not have a choice about whether third-party cookies would be placed on her device and/or intercepted by the Third Parties along with her user data; rather, Defendants had already caused that to happen.

105. Then, as Plaintiff Pasquini continued to browse the BabyCenter Website in reliance on the promises Defendants made in the cookie consent banner, and despite Plaintiff Pasquini's clear denial of consent to the use and/or placement of such cookies and tracking technologies, Defendants nonetheless continued to cause the placement and/or transmission of

cookies along with user data, including those involved in providing personalized content, advertising, and analytics from the Third Parties on her device. In doing so, Defendants permitted the Third Parties to track and collect Plaintiff Pasquini's Private Communications as Plaintiff Pasquini browsed the BabyCenter Website.

106. Defendants' representations that consumers could withhold consent while Plaintiff Pasquini and users browsed the BabyCenter Website, or at least those involved in providing personalized content, advertising, and analytics, were untrue. Had Plaintiff Pasquini known this fact, she would not have used the Website. Moreover, Plaintiff Pasquini reviewed the popup cookie consent banner prior to using the BabyCenter Website. Had Defendants disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to deny consent to the use of all cookies, Plaintiff Pasquini would have noticed it and would not have used the Website or, at a minimum, she would have interacted with the Website differently.

107. Plaintiff Pasquini continues to desire to browse content featured on the Websites. Plaintiff Pasquini would like to browse websites that do not misrepresent that users can deny consent to the use of all cookies and tracking technologies. If the Websites were programmed to honor users' requests to deny consent to the use of all cookies and tracking technologies, Plaintiff Pasquini would likely browse the Website again in the future, but will not do so until then. Plaintiff Pasquini regularly visits websites that feature content similar to that of the Websites. Because Plaintiff Pasquini does not know how the Websites are programmed, which can change over time, and because she does not have the technical knowledge necessary to determine whether the Websites honor users' requests to deny consent to the use of all cookies and tracking technologies, Plaintiff Pasquini will be unable to rely on Defendants' representations when browsing the Website in the future absent an injunction that prohibits Defendants from making misrepresentations on the Websites. The only way to determine what network traffic is intercepted by third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the

HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Pasquini is not a software developer and has not received training with respect to HTTP network calls.

**Plaintiff Roark**

108. Plaintiff Roark visited the BabyCenter Website on multiple occasions between 2023 and 2025 to seek and obtain information regarding pregnancy, infant and child development, and related health and parenting topics while located in California. In particular, after her daughter became pregnant in 2023, Plaintiff Roark used the BabyCenter Website to obtain information regarding pregnancy development and milestones, developmental milestones after birth, child growth and percentiles, baby names, and other pregnancy- and child-related topics.

109. During her visits, Plaintiff Roark frequently used the Website's search functionality. Among other things, she searched for and accessed information concerning pregnancy and developmental milestones, child growth and percentiles, and health symptoms, including coughing and constant throat clearing. Plaintiff Roark also used interactive features on the Website, including a due-date calculator, percentile calculator, due-date tracker, milestone tracker, and quizzes concerning topics such as personality and safety.

110. Plaintiff Roark also maintained an account with BabyCenter and provided personal information about her daughter and grandchildren to the Website, including her name, address, date of birth, location, information regarding the pregnancies and due dates, health information, and the names and birth dates of her children and/or grandchildren. She also received newsletters, emails, and personalized content concerning child and infant development. Plaintiff Roark's visits to the BabyCenter Website were consistent with those of an ordinary user seeking pregnancy, health, child-development, and parenting information. Plaintiff Roark is not a consumer advocate, "tester," or compliance auditor who visited the BabyCenter Website to test or evaluate Defendants' privacy practices.

111. When Plaintiff Roark visited the BabyCenter Website, it immediately detected that she was a visitor in California and presented her with Defendants' popup cookie consent banner, which provided the option to select the "Do Not Consent" button. Plaintiff Roark viewed

Defendants' representation on the popup cookie consent banner that, "This website uses cookies to personalize content, analytics and ads. We also share information about the way you interact with our website, including health information interests, with our advertising and analytics partners who may aggregate this data with other information they have about you. Please click I Consent below to give us permission to do this." Plaintiff Roark also viewed Defendants' additional representation that users could "click Do Not Consent."

112. Plaintiff Roark clicked the "Do Not Consent" button. Plaintiff Roark believed that selecting the "Do Not Consent" button on the popup cookie consent banner found on the BabyCenter Website would allow her to opt out of, decline, and/or reject all cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks and analytics services for the purposes of providing personalized content, advertising, and analytics services).

113. In selecting the "Do Not Consent" Button Plaintiff Roark gave Defendants notice that she did not consent to the use or placement of cookies and tracking technologies while browsing the BabyCenter Website. Further, Plaintiff Roark specifically denied consent, based on Defendants' representations, to those cookies used to "personalize content, analytics and ads" and share information with third parties. In reliance on these representations and promises, only then did Plaintiff Roark continue browsing the BabyCenter Website.

114. Even before the popup cookie consent banner appeared on the screen, Defendants nonetheless caused cookies and tracking technologies, including those used for personalized content, advertising, and analytics, to be placed on Plaintiff Roark's device and/or t intercepted by the Third Parties along with user data, without Plaintiff Roark's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Roark that she could deny consent to the use of cookies and tracking technologies while she browsed the BabyCenter Website was false. Contrary to what Defendants made Plaintiff Roark believe, she did not have a choice about whether third-party cookies would be placed on her device and/or intercepted by the Third Parties along with her user data; rather, Defendants had already caused that to happen.

115. Then, as Plaintiff Roark continued to browse the BabyCenter Website in reliance

on the promises Defendants made in the cookie consent banner, and despite Plaintiff Roark's clear denial of consent to the use and/or placement of such cookies and tracking technologies, Defendants nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing personalized content, advertising, and analytics from the Third Parties on her device. In doing so, Defendants permitted the Third Parties to track and collect Plaintiff Roark's Private Communications as Plaintiff Roark browsed the Website.

116. Defendants' representations that consumers could withhold consent while Plaintiff Roark and users browsed the BabyCenter Website, or at least those involved in providing personalized content, advertising, and analytics, were untrue. Had Plaintiff Roark known this fact, she would not have used the Website. Moreover, Plaintiff Roark reviewed the popup cookie consent banner prior to using the BabyCenter Website. Had Defendants disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to deny consent to the use of all cookies, Plaintiff Roark would have noticed it and would not have used the Website or, at a minimum, she would have interacted with the Website differently.

117. Plaintiff Roark continues to desire to browse content featured on the Websites. Plaintiff Roark would like to browse websites that do not misrepresent that users can deny consent to the use of all cookies and tracking technologies. If the Websites were programmed to honor users' requests to deny consent to the use of all cookies and tracking technologies, Plaintiff Roark would likely browse the Website again in the future, but will not do so until then. Plaintiff Roark regularly visits websites that feature content similar to that of the Websites. Because Plaintiff Roark does not know how the Websites are programmed, which can change over time, and because she does not have the technical knowledge necessary to determine whether the Websites honor users' requests to deny consent to the use of all cookies and tracking technologies, Plaintiff Roark will be unable to rely on Defendants' representations when browsing the Website in the future absent an injunction that prohibits Defendants from making misrepresentations on the Websites. The only way to determine what network traffic is

intercepted by third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Roark is not a software developer and has not received training with respect to HTTP network calls.

## CLASS ALLEGATIONS

118. Plaintiffs bring this Class Action Complaint on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following group of similarly situated persons, defined as follows:

> **Class**: All persons who browsed any of the Websites in the state of California after clicking the "Do Not Consent" button in the Website's popup cookies consent banner.

119. This action has been brought and may properly be maintained as a class action against Defendants because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

120. **Numerosity:** Plaintiffs do not know the exact size of the Class, but they estimate that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

121. **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each class member's claim derives from the same unlawful conduct that led them to believe that Defendants would not cause third-party cookies to be placed on their browsers and devices and/or intercepted by third parties along with user data, after Class members chose to deny consent for the use of all cookies and tracking technologies on the Website, nor would Defendants permit third parties to track and collect Class members' Private Communications as Class members browsed the Website.

122. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a. Whether Defendants' actions violate California laws invoked herein; and

b. Whether Plaintiffs and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

123. Typicality: Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, Plaintiffs, like the other Class members, visited the Website, clicked the "Do Not Consent" button, and had their confidential Private Communications intercepted by the Third Parties.

124. Adequacy of Representation: Plaintiffs will fairly and adequately protect the interests of all Class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the Class. By prevailing on their claims, Plaintiffs will establish Defendants' liability to all Class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

125. Superiority: There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendants and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently,

and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### First Cause of Action: Invasion of Privacy

126. Plaintiffs reallege and incorporate the paragraphs of this Complaint as if set forth herein.

127. To plead an invasion of privacy claim, Plaintiffs must show (i) an invasion of a legally protected privacy interest; (ii) a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendant constituting a serious invasion of privacy.

128. Defendants have intruded upon the following legally protected privacy interests of Plaintiffs and Class members: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Plaintiffs' and Class members' Fourth Amendment right to privacy.

129. Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as Defendants affirmatively promised users they could click a "Do Not Consent" button to reject tracking technologies before proceeding to browse the Website. Plaintiffs and other Class members directed their electronic devices to access the Website and, when presented with the popup cookies consent banner on the Website, Plaintiffs and Class members denied consent and reasonably expected that their denial of consent to the use of cookies and tracking technologies would be honored. That is, they reasonably believed that Defendants would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on

their devices while they browsed the Website. Plaintiffs and Class members also reasonably expected that, if they denied consent to use such cookies and/or tracking technologies, Defendants would not permit the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Website.

130. Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140(v)(1)(F).

131. Defendants, in violation of Plaintiffs' and other Class members' reasonable expectation of privacy and without their consent, permits the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California. The data that Defendants allowed the Third Parties to collect enables the Third Parties to (and they in fact do), *inter alia*, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiffs' and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

132. Defendants' actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

133. Defendants' intrusion into Plaintiffs' privacy was also highly offensive to a reasonable person.

134. Defendants lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

135. Plaintiffs and Class members have been damaged by Defendants' invasion of their privacy and are entitled to just compensation, including monetary damages.

136. Plaintiffs and Class members seeks appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendants as a result of their intrusions upon Plaintiffs' and Class members' privacy.

137. Plaintiffs and Class members seek punitive damages because Defendants' actions—which were malicious, oppressive, or willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' denial of consent to the Website's use of cookies. Punitive damages are warranted to deter Defendants from engaging in future misconduct.

**<u>Second Cause of Action</u>: Intrusion Upon Seclusion**

138. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

139. To assert a claim for intrusion upon seclusion, Plaintiffs must plead (i) that Defendants intentionally intruded into a place, conversation, or matter as to which Plaintiffs had

a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

140. By permitting third-party cookies to be stored on consumers' devices without consent, which caused the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendants' representations otherwise in the popup cookie consent banner, Defendants intentionally intruded upon the solitude or seclusion of Website users. Defendants effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

141. The Third Parties' tracking and collecting of Plaintiffs' and Class member's Private Communications on the Website using third-party cookies that Defendants caused to be stored on users' devices—and to be intercepted by the Third Parties—was not authorized by Plaintiffs and Class members, and, in fact, those Website users specifically chose not to consent.

142. Plaintiffs and the Class members had an objectively reasonable expectation of privacy surrounding their Private Communications on the Website based on Defendants' promise that users could deny consent, as well as state criminal and civil laws designed to protect individual privacy.

143. Defendant's intentional intrusion into Plaintiffs' and other users' Private Communications would be highly offensive to a reasonable person given that Defendants represented that Website users could withhold consent when, in fact, Defendants caused such third-party cookies to be stored on consumers' devices and browsers, and to be intercepted by third parties, even when consumers denied consent to use all such cookies. Indeed, Plaintiffs and Class members reasonably expected, based on Defendants' false representations, that when they denied consent from the use of cookies and tracking technologies, Defendants would not cause such third-party cookies to be stored on their devices or permit the Third Parties to obtain their Private Communications on the Website, including their browsing history, visit history, website

interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

144. Defendants' conduct was intentional and intruded on Plaintiffs' and users' Private Communications on the Website.

145. Plaintiffs and Class members have been damaged by Defendants' invasion of their privacy and are entitled to just compensation, including monetary damages.

146. Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendants as a result of their intrusions upon Plaintiffs' and Class members' privacy.

147. Plaintiffs and Class members seek punitive damages because Defendants' actions—which were malicious, oppressive, or willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' decision to deny consent from the Website's use of cookies. Punitive damages are warranted to deter Defendants from engaging in future misconduct.

**<u>Third Cause of Action</u>: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)**

148. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

149. California Penal Code § 631(a) provides, in pertinent part:

> "Any person [i] who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or [ii] who in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [iii] who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or [iv] who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

150. Each of the Defendants is a "person" within the meaning of California Penal Code § 631.

151. The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties—constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendant's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

152. Each of the Third Parties is a separate legal entity that offers a software-as-a-service and not merely a passive device. Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes. Accordingly, the Third Parties were third parties to any communication between Plaintiffs and Class members, on the one hand, and Defendants, on the other.

153. Under § 631(a), Defendants must show they had the consent of all parties to a communication.

154. At all relevant times, the Website caused Plaintiffs and Class members' browsers to store the Third Parties' cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties without Plaintiffs' and Class members' consent. By configuring the Website in this manner, Defendants willfully aided, agreed with, employed, permitted, or otherwise caused the Third Parties to wiretap Plaintiffs and Class members using the Third Parties' cookies and to accomplish the wrongful conduct alleged herein.

155. At all relevant times, by their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiffs and Class members, on the one hand, and Defendants, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

156. The Private Communications of Plaintiffs and Class members, on the one hand, and Defendants, on the other, that the Third Parties automatically intercepted directly communicate the Website user's affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

157. At all relevant times, the Third Parties used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

158. Plaintiffs and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Class members' electronic communications. Nor did Plaintiffs and Class members provide their prior consent to Defendants aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct. On the contrary, Plaintiffs and Class members expressly declined to allow Third Parties' cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic communications by choosing to deny consent to the use of cookies in the consent banner.

159. The wiretapping of Plaintiffs and Class members occurred in California, where Plaintiffs and Class members accessed the Websites and where the Third Parties—as caused by Defendants—routed Plaintiffs' and Class members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties, resided on Plaintiffs' California-located devices. In particular, the user's California-based device, after downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

160. Plaintiffs and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of their right to privacy, (ii) loss of value in their Private Communications, (iii) damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their Private Communications, and (iv) loss of their Private Communications to the Third Parties without their consent.

161. Pursuant to California Penal Code § 637.2, Plaintiffs and Class members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendants' violations of CIPA § 631(a), as well as injunctive relief.

162. Unless enjoined, Defendants will continue to commit the illegal acts alleged herein including, but not limited to, permitting the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendants. Plaintiffs, Class members, and the general public continue to be at risk because Plaintiffs, Class members, and the general public frequently use the internet to search for information and content related to health and wellness products. Plaintiffs, Class members, and the general public continue to desire to use the internet for that purpose. Plaintiffs, Class members, and the general public have no practical way to know if their decision not to consent to cookies and tracking technologies will be honored and/or whether Defendants will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendants. Further, Defendants have already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendants and will continue to do so unless and until enjoined.

**<u>Fourth Cause of Action</u>: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51)**

163. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

164. The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

165. California Penal Code Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

166. A "pen register" is a "device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

167. The Third Parties' cookies and the corresponding software code installed by Defendant on its Website are each "pen registers" because they are "device[s] or process[es]" that record or decode the "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiffs' and the Subclass members' computers or devices. Cal. Penal Code § 638.50(b).

168. At all relevant times, Defendant caused pen registers (e.g., the Third Party software code and cookies) to be placed on Plaintiffs' and Subclass members' browsers and devices. This software code established and maintained network connections between the users' devices and the Third Parties, and also caused cookies, user data and metadata, and addressing and networking information (including, without limitation, IP addresses, port numbers, protocol-level metadata, HTTP request header metadata, and user-agent information), to be intercepted by the Third Parties.

169. Some of the information collected by the Third Parties' cookies and the corresponding software, including IP addresses and user-agent information, does not constitute the content of Plaintiffs' and the Class members' electronic communications with the Website.

170. Plaintiffs and Class members did not provide their prior consent to Defendants' use of third-party cookies and the corresponding software. On the contrary, Plaintiffs and the

Class members informed Defendants that they did not consent to the Website's use of third-party cookies by clicking the "Do Not Consent" button in the cookie consent banner.

171. Defendants did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiffs' and Class member's IP addresses and user-agent information.

172. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members suffered losses and were damaged in an amount to be determined at trial.

173. Pursuant to Penal Code § 637.2(a)(1), Plaintiffs and Class members are also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a).

**<u>Fifth Cause of Action</u>: Common Law Fraud, Deceit and/or Misrepresentation**

174. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

175. Defendants fraudulently and deceptively informed Plaintiffs and Class members that they could deny consent to the use of cookies.

176. Defendants affirmatively chose to deploy a cookie consent banner governing the collection, sharing, and use of users' Private Communications on the Website.

177. By implementing the cookie banner, Defendants undertook responsibility for ensuring that the banner accurately communicated users' privacy choices and properly effectuated those choices.

178. Defendants and/or their agents configured and managed which technologies loaded and transmitted data before and after a user disabled third party cookies, including through consent management settings and/or platforms, tag-management rules, and related implementation choices under Defendants' control. On information and belief, Defendants operated, controlled, configured, approved, or maintained settings that permitted the Third Parties' tracking technologies to continue collecting users' Private Communications even after users selected options indicating their choice to reject cookies and deny consent to the collection, use, sale, and/or sharing of their Private Communications.

179. Industry documentation for the consent management platforms and Third Parties' technologies used on the Websites explains that website operators, i.e., Defendants, must

affirmatively configure consent settings and tag behavior to prevent tracking technologies from firing after users reject cookies. On information and belief, Defendants received, reviewed, or had access to such implementation guidance in deploying the challenged technologies on the Websites. On information and belief, Defendants had the ability during the relevant time period to audit, test, configure, disable, or modify, the cookie consent banner, consent-management functionality, and Third-Party tracking technologies operating on the Websites. Defendants had information available to it demonstrating that users' purported opt-out selections were not being honored and that users' Private Communications continued to be collected and intercepted by the Third Parties notwithstanding Defendants' contrary representations.

180. Defendants also used the Third Parties' analytics, advertising, and reporting dashboards to monitor Website traffic, user behavior, advertising performance, and related engagement metrics generated through the challenged cookie and tracking technologies. Through these dashboards and related reporting tools, Defendants had access to information reflecting that user data continued to be intercepted by and processed by the Third Parties notwithstanding users' purported opt-out selections. Defendants routinely reviewed, monitored, and relied upon data generated through the Third Parties' resources for advertising, analytics, personalization, attribution, and/or website performance purposes.

181. Industry standards, privacy frameworks, and applicable statutes and regulations, including California's California Consumer Privacy Act and related regulations, require website operators deploying cookie consent banners to ensure that consent mechanisms function properly and accurately record and enforce user choices. *See*, *e.g*., California Consumer Privacy Rights Act § 7025(c) (enumerating requirements for businesses that receive an "opt out preference signal."); *id*. § 7101 (business record keeping requirements regarding opt out requests).

182. On information and belief, Defendants either knew their representations regarding users' ability to reject cookies and deny consent to data sharing were false, lacked any reasonable basis for believing those representations were true, or made those representations carelessly and recklessly despite information available to Defendants demonstrating that users'

data continued to be collected and intercepted by the Third Parties after users attempted to opt out.

183. However, despite Defendants' representations otherwise, Defendants caused third-party cookies and software code to be stored on consumers' devices, and to be intercepted by the Third Parties alongside Private Communications, even after users clicked the "Do Not Consent" button in the popup cookie consent banner. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' Private Communications, even when consumers had previously chosen to deny consent to the use of cookies.

184. These misrepresentations and omissions were known exclusively to, and actively concealed by Defendants, not reasonably known to Plaintiffs and Class members, and material at the time they were made. Defendants' misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs and Class members as to whether to use the Website. In misleading Plaintiffs and Class members and not so informing them, Defendants breached their duty to Plaintiffs and Class members. Defendants also gained financially from, and as a result of, their breaches.

185. Plaintiffs and Class members relied to their detriment on Defendants' misrepresentations and fraudulent omissions.

186. Plaintiffs and Class members have suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendants' unfair, deceptive, and/or unlawful practices, including the unauthorized interception of their Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiffs and Class members have also suffered harm in the form of diminution of the value of their private and personally identifiable information and communications.

187. Defendants' actions caused damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their personal information and communications.

188. Defendants' representation that consumers could deny consent to the use of cookies (including cookies used to "personalize content, analytics and ads") if they clicked the "Do Not Consent" button was untrue. Again, had Plaintiffs and Class members known these facts, they would not have used the Website. Moreover, Plaintiffs and Class members reviewed the popup cookie consent banner prior to their interactions with the Website. Had Defendants disclosed that it caused third-party cookies to be stored on Websites visitors' devices that are related to personalization, advertising and analytics and/or share information with third parties even after they choose to deny consent to the use of cookies, Plaintiffs and Class members would have noticed it and would not have interacted with the Website.

189. By and through such fraud, deceit, misrepresentations and/or omissions, Defendants intended to induce Plaintiffs and Class members to alter their positions to their detriment. Specifically, Defendants fraudulently and deceptively induced Plaintiffs and Class members to, without limitation, use the Website under the mistaken belief that Defendants would not permit third parties to obtain users' Private Communications when consumers chose to deny consent to the use of cookies. As a result, Plaintiffs and the Class provided more personal data than they would have otherwise.

190. Plaintiffs and Class members justifiably and reasonably relied on Defendants' misrepresentations and omissions, and, accordingly, were damaged by Defendants' conduct.

191. As a direct and proximate result of Defendants' misrepresentations and/or omissions, Plaintiffs and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

192. Plaintiffs and Class members seek punitive damages because Defendants' actions—which were malicious, oppressive, or willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and

Plaintiffs' and Class members' denial of consent to the Websites' use of cookies. Punitive damages are warranted to deter Defendants from engaging in future misconduct.

**<u>Sixth Cause of Action</u>: Unjust Enrichment**

193. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

194. Defendants created and implemented a scheme to increase their own profits through a pervasive pattern of false statements and fraudulent omissions.

195. Defendants were unjustly enriched as a result of their wrongful conduct, including through their misrepresentation that users could deny consent to the use of cookies and by permitting the Third Parties to store and transmit cookies on Plaintiffs' and Class members' devices and browsers, which permitted the Third Parties to track and collect users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Class members denied consent to use such cookies.

196. Plaintiffs and Class members' Private Communications have conferred an economic benefit on Defendants.

197. Defendants have been unjustly enriched at the expense of Plaintiffs and Class members, and Defendants have unjustly retained the benefits of their unlawful and wrongful conduct.

198. Defendants appreciated, recognized, and chose to accept the monetary benefits that Plaintiffs and Class members conferred onto Defendants at their detriment. These benefits were the expected result of Defendants acting in their pecuniary interest at the expense of Plaintiffs and Class members.

199. It would be unjust for Defendants to retain the value of Plaintiffs' and Class members' property and any profits earned thereon.

200. There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

201. Plaintiffs and Class members are entitled to restitution of the benefits Defendants unjustly retained and/or any amounts necessary to return Plaintiffs and Class members to the position they occupied prior to having their Private Communications tracked and collected by the Third Parties.

202. Plaintiffs plead this claim separately, as well as in the alternative, to their other claims, as without such claims Plaintiffs would have no adequate legal remedy.

**PRAYER FOR RELIEF**

**WHEREFORE**, reserving all rights, Plaintiffs, on behalf of themselves and the Class members, respectfully requests judgment against Defendants as follows:

A. Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

B. An award of compensatory damages, including statutory damages where available, to Plaintiffs and Class members against Defendants for all damages sustained as a result of Defendants' wrongdoing, including both pre- and post-judgment interest thereon;

C. An award of punitive damages;

D. An award of nominal damages;

E. An order for full restitution;

F. An order requiring Defendants to disgorge revenues and profits wrongfully obtained;

G. An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

H. For reasonable attorneys' fees and the costs of suit incurred; and

I. For such further relief as may be just and proper.

/ / /

/ / /

/ / /

Dated: September 4, 2026

**GUTRIDE SAFIER LLP**

*/s/ Seth Safier /s/*
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiffs*